PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 19-3544

UNITED STATES OF AMERICA

v.

WAYNE BELLILLE a/k/a Wizo

ALEXANDER GOLUBITSKY,
Appellant

Appeal from the
District of the Virgin Islands
(D.C. Criminal Action No. 3-18-cr-00030-011)
District Judge: Honorable Curtis V. Gomez

Argued April 8, 2020

Before: AMBRO, GREENAWAY, JR.,
and BIBAS, Circuit Judges

(Opinion filed: June 16, 2020)

Alexander Golubitsky (Argued)
DiRuzzo & Company
6501 Red Hook Plaza, Suite 201
St. Thomas, VI 00802

    Counsel for Appellant

Gretchen C.F. Shappert
  United States Attorney
Meredith J. Edwards (Argued)
George A. Massucco-LaTaif
Alessandra P. Serano
Office of United States Attorney
5500 Veterans Drive
United States Courthouse, Suite 260
St. Thomas, VI 00802

    Counsel for Appellee

_____

OPINION  OF  THE  COURT

_____

AMBRO, <u>Circuit Judge</u>

Alexander Golubitsky, Esq., appeals the District Court's denial of his motion to withdraw as appointed criminal counsel due to a conflict of interest. Though it is not a final order, we nonetheless have appellate jurisdiction to hear this interlocutory appeal and review the order denying the motion to withdraw under the collateral order doctrine first announced in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). On the merits, we vacate the District Court's order

denying the motion to withdraw and remand for further fact-finding.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Golubitsky is a former panelist on the Criminal Justice Act ("CJA") panel in the District Court of the Virgin Islands. He is currently admitted to practice before that Court. Per its CJA plan, on March 25, 2019, Golubitsky was appointed counsel for Wayne Bellille, an indigent defendant in a large multi-defendant RICO prosecution.

Golubitsky moved to withdraw shortly after. He argued that he was no longer a member of the CJA panel and that he had moved to an in-house counsel role, was contractually barred from taking on the representation, and lacked the ability and resources to represent Bellille. Golubitsky thereafter entered an appearance for Bellille and attended a hearing on the motion to withdraw. The District Court denied his motion.

On September 11, 2019, Golubitsky and Joseph DiRuzzo III purport to have started an of-counsel relationship at the law firm of DiRuzzo & Company. On September 20, Golubitsky filed an ex parte emergency motion to withdraw as Bellille's counsel. He stated that he had recently associated on an "of counsel" basis with the DiRuzzo law firm and had learned during a conflicts check that the firm's principal, DiRuzzo, represented a cooperating witness, Aracelis Ayala, who was likely to testify against Bellille in his trial. Golubitsky argued that, because he would have to cross-examine Ayala at trial, this created a conflict of interest under local court rules and the Virgin Islands Rules of Professional Conduct.

The District Court held a hearing to consider the motion on October 30 and 31, 2019. DiRuzzo attended the second day. During the hearing, the Court inquired as to the nature of the

3

association between Golubitsky and DiRuzzo's firm. Golubitsky explained that he was "on [the firm's] system," could bill using the firm's software, and was added to DiRuzzo's malpractice insurance. J.A. 108. DiRuzzo confirmed the same. Golubitsky, however, continued to work full-time as in-house counsel at a Virgin Islands-based company, Brisa Max Holdings VI, LLC ("Brisa Max"), while working part-time for DiRuzzo's firm, which is located in Florida. Aside from the Bellille prosecution, DiRuzzo and Golubitsky were litigating four matters together. The Court inquired whether they had any involvement in the other's work related to Bellille's case or whether they had shared with each other any information about the case obtained in the course of their respective representations. Both responded they had not. DiRuzzo testified that he was not sure he could implement "screening" measures in the Bellille matter but would look into it, and Golubitsky maintained that "I don't think that I can be walled off from this conflict," J.A. 109, as the DiRuzzo firm consisted of just two attorneys aside from Golubitsky. Golubitsky would be forced, he believed, to violate his ethical obligations, and his client's Sixth Amendment right to conflict-free counsel would be violated as well.

At the end of the hearing, the District Court orally denied Golubitsky's motion to withdraw and ordered DiRuzzo and Golubitsky to wall off the latter's representation of Bellille from DiRuzzo's representation of Ayala. The Court emphasized that the relationship between DiRuzzo and Golubitsky was "part-time" and "ad hoc," and thus a wall could effectively be put in place to separate the representations. J.A. 141. Golubitsky appealed to us.

On March 24, 2020, well after this appeal was filed, the District Court issued a written opinion denying Bellille's motion to withdraw. It reasoned that attorney conflicts are not imputed to a law firm if the relationship between the attorney

4

and the firm is not a sufficiently close one. *See United States v. Bellille*, Cr. No. 2018-30, 2020 WL 1441648, at \*6–7 (D.V.I. Mar. 24, 2020) (citing *United States v. Kilpatrick*, 798 F.3d 365, 375–76 (6th Cir. 2015); *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 135–36 (2d Cir. 2005)). The Court did not mention the conflict wall it had ordered the attorneys to put in place and did not explain why it would be necessary if there is no conflict of interest or how it should be implemented if a conflict does exist. It noted, however, that the Federal Public Defender and most CJA panelists in the Virgin Islands are conflicted in the underlying criminal case and that "the existing CJA panel is inadequate to provide representation as required to the defendants in this matter." *Id.* at \*5.

## II. JURISDICTION

The District Court of the Virgin Islands had subject matter jurisdiction under 48 U.S.C. § 1612(a) and 18 U.S.C. § 3231. But was its order denying Golubitsky's second motion to withdraw appealable to us? The Government says no, as the final judgment rule requires that "a party must ordinarily raise all claims of error in a single appeal following final judgment on the merits." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981). Golubitsky responds that we have jurisdiction under the collateral order doctrine.

That doctrine—first announced in *Cohen*, 337 U.S. 541—provides that there is a "small class" of rulings that, although they do not terminate the litigation, are appropriately deemed "final" under 28 U.S.C. § 1291. *Firestone*, 449 U.S. at 374; *Cohen*, 337 U.S. at 546. That small class is comprised of decisions that (1) conclusively determine the disputed issues, (2) resolve important issues separate from the merits, and (3) are effectively unreviewable on appeal from the final

5

judgment in the underlying action. *See, e.g.*, *Bacher v. Allstate Ins. Co.*, 211 F.3d 52, 53 (3d Cir. 2000).

The Government cites Supreme Court precedent that the collateral order doctrine does not apply to orders granting motions for disqualification of defense counsel. *See Flanagan v. United States*, 465 U.S. 259 (1984). No doubt *Flanagan* concluded that "[n]othing about a disqualification order distinguishes it from the run of pretrial judicial decisions that affect the rights of criminal defendants yet must await completion of trial-court proceedings for review." *Id.* at 270. And the Government correctly points out that other circuits to address the issue have also held orders granting or denying motions to disqualify are not subject to the collateral order doctrine. *See, e.g.*, *United States v. Sueiro*, 946 F.3d 637, 642–43 (4th Cir. 2020); *United States v. Camisa*, 969 F.2d 1428, 1429 (2d Cir. 1992); *United States v. Caggiano*, 660 F.2d 184, 191 & n.7 (6th Cir. 1981).

However, courts have distinguished motions to *disqualify* from motions to *withdraw*. Neither the Supreme Court, nor any court of appeals to consider the issue, has held that the denial of a motion to withdraw fails interlocutory review under the collateral order doctrine in civil cases. *See, e.g.*, *Sanford v. Maid-Rite Corp.*, 816 F.3d 546, 549 (8th Cir. 2016) (per curiam) (holding that denying a motion to withdraw satisfied each of the three requirements of the doctrine because, "[f]irst, it conclusively determined whether the firm must continue to represent its client. . . . Second, the withdrawal issue was 'completely separate from the merits . . . .' Finally, the order would have been unreviewable on appeal from a final judgment because 'having to go through trial is itself a loss of the right involved.'" (citations omitted)); *Brandon v. Blech*, 560 F.3d 536, 537 (6th Cir. 2009) ("An order compelling an attorney to continue work without compensation is just the sort of order the doctrine contemplates: it conclusively determined

the withdrawal question, is unrelated to the merits, cannot be rectified after a final judgment, and may impose significant hardship."); *Rivera-Domenech v. Calvesbert Law Offices PSC*, 402 F.3d 246, 249 (1st Cir. 2005); *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercty. Nat'l Title Ins. Co.*, 310 F.3d 537, 539–40 (7th Cir. 2002); *Whiting v. Lacara*, 187 F.3d 317, 319–20 (2d Cir. 1999) (per curiam). This distinction exists because, "[u]nlike an order granting or denying a motion to disqualify an attorney, which primarily affects the interests of the underlying litigants . . . , an order denying counsel's motion to withdraw primarily affects the counsel forced to continue representing a client against his or her wishes." *Whiting*, 187 F.3d at 320 (per curiam) (citation omitted). "[O]nce a final judgment has been entered, the harm to [the attorney] will be complete, and no relief can be obtained on appeal." *Id.*

We have not squarely addressed whether the collateral order doctrine applies to orders denying motions to withdraw due to a conflict of interest. In *Ohntrup v. Firearms Center, Inc.*, 802 F.2d 676 (3d Cir. 1986), we held that an order denying a law firm's motion to withdraw after entry of judgment, but before the conclusion of post-judgment discovery, was immediately appealable although there were still proceedings ongoing in the district court. We relied on the doctrine of "practical finality" and did not address the collateral order doctrine, but the reasoning was much the same as above: the attorney would "be effectively denied meaningful review of the order" if not permitted to appeal immediately. *Id.* at 678.

Years later, *United States v. Bertoli*, 994 F.2d 1002 (3d Cir. 1993), held that the collateral order doctrine did not apply to an order appointing a firm as standby counsel for its former client. The district court required the firm to serve without compensation, that a firm attorney be present at all pretrial proceedings, and that two named partners be present

7

throughout the months-long trial. *Id.* at 1007–10. We reasoned that although the order met the first two collateral-order prongs—it conclusively determined the disputed question and resolved an important issue completely separate from the merits—it failed the third, which requires the order to be effectively unreviewable on appeal from a final judgment. *Id.* at 1014. But because the order raised "fundamental, unsettled issues concerning a district court's inherent power over the attorneys who practice before it," *id.* at 1005, we treated the appeal as a petition for a writ of mandamus and exercised jurisdiction, *see id.* at 1014–15. We ultimately held that the district court had abused its discretion in ordering the firm to serve under the circumstances. *Id.* at 1006.[1]

The Government asserts *Bertoli* held that orders denying motions to withdraw are categorically exempt from the collateral order doctrine.[2] We disagree. In *Bertoli* we did

---

[1] Golubitsky mentions two unreported decisions of our Court holding that the collateral order doctrine applies to orders denying motions to withdraw. *Erie Molded Plastics, Inc. v. Nogah, LLC*, 520 F. App'x 82, 84 (3d Cir. 2013); *United States ex rel. Magid v. Barry Wilderman M.D., P.C.*, 305 F. App'x 41, 42 (3d Cir. 2008). We, however, do not rely on either, as by tradition we do not cite as authority our not precedential opinions. 3d Cir. I.O.P. 5.7.

[2] The Government alternatively relies on our statement in *Bertoli* that we prefer "to postpone review of an order directed against a non-party until the case is concluded in the district court or until the non-party has been held in contempt," 994 F.2d at 1013, to argue that non-parties such as Golubitsky must suffer contempt before they can appeal. However, we also made clear that contempt may be unnecessary "if there is

8

not consider a motion to withdraw as counsel based on a conflict of interest, but rather to withdraw as stand-by counsel based on the onerous conditions imposed by the district court. Whether Golubitsky will be forced to violate his ethical obligations and whether he will be denied meaningful review after trial are before us here. And as noted, we ultimately decided *Bertoli* on principles applicable to the rarely invoked writ of mandamus, not something we even consider here. Given the interests Golubitsky claims are violated, our analysis of the third prong of the collateral order doctrine is different than in *Bertoli*. It thus does not foreclose the possibility that the collateral order doctrine applies to orders denying motions to withdraw.[3]

---

no real possibility of [an appeal] disrupting an underlying action," *see id*. (quoting *United States v. Sciarra*, 851 F.2d 621, 629 (3d Cir. 1988)), and the Government has made no allegation of disruption flowing from Golubitsky's appeal. In fact, at oral argument it noted that if Golubitsky were removed as counsel, the District Court would likely appoint replacement counsel "in short order." Tr. 24. Moreover, we have never read *Bertoli* for the broad proposition that non-parties must suffer contempt before securing appellate review.

[3] Golubitsky argues in the alternative that the All Writs Act, 28 U.S.C. § 1651, gives us jurisdiction because we disposed of *Bertoli*, 994 F.2d 1002, by treating the petition as one seeking a writ of mandamus, *id.* at 1014. We need not decide this contention because here the collateral order doctrine applies. Moreover, mandamus is not warranted if the relief sought can be obtained through another means. *See Hollingsworth v. Perry,* 558 U.S. 183, 190 (2010) (per curiam) (explaining that to obtain mandamus relief a petitioner must

If there is tension between the conclusion in *Ohntrup* that the attorney would "be effectively denied meaningful review of the order" denying his motion to withdraw if not permitted to appeal until after the conclusion of post-judgment discovery, 802 F.2d at 678, and the conclusion in *Bertoli* that the attorneys did not show that the order would be effectively unreviewable after trial, 994 F.2d at 1014, we hold that a motion to withdraw were there a conflict of interest would be effectively unreviewable because the harm of violating one's ethical obligations would be complete and could not be undone after trial. We need not rely on either the doctrine of practical finality or the dramatic remedy of mandamus because all three prongs of the collateral order doctrine are satisfied.

Although the weight of the authority holding that orders denying motions to withdraw are collaterally appealable is civil in nature, the reasons for applying the collateral order doctrine are equally compelling in the criminal context. The Second Circuit has so held. *See United States v. Barton*, 712 F.3d 111, 116 (2d Cir. 2013) (citing *Whiting*, 187 F.3d at 320 (per curiam)); *United States v. Oberoi*, 331 F.3d 44, 47 (2d Cir. 2003). It analogized the denial of a motion to withdraw to the "denial of immunity or of a double jeopardy claim, which are reviewable under the collateral order doctrine on the ground that having to go through a trial is itself a loss of the right involved." *Whiting*, 187 F.3d at 320 (per curiam). The ethical violations counsel would be forced to commit for conflicts of interest are the same in the civil and criminal context. Once a

_____

show, inter alia, that "no other adequate means [exist] to attain the relief he desires" (alteration in original) (quoting *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004))). In our case, appellate jurisdiction to decide is not only adequate, but it is more so than the last resort of mandamus.

court compels an attorney to violate ethical obligations, the harm is done, whether the matter be a civil or a criminal trial.

In sum, Golubitsky's interlocutory appeal satisfies all three requirements of the collateral order doctrine. First, the District Court's denial of his motion conclusively determined its outcome. The Court denied his motion to withdraw and ordered Golubitsky and DiRuzzo to erect a wall separating their representations of Bellille and Ayala. Second, whether Golubitsky has a conflict of interest is separate from the merits of the underlying criminal matter involving a vast RICO conspiracy. Likewise, any order directing him and DiRuzzo on how to arrange their purported law practice is separate from the trial's merits. And the order will effectively be unreviewable after trial, as Golubitsky will already have suffered the harm of being forced to violate his ethical obligations. *See Sanford*, 816 F.3d at 549 (per curiam) (holding that order denying motion to withdraw was effectively unreviewable after case conclusion); *Whiting*, 187 F.3d at 319–20 (per curiam) (same).

Accordingly, we have appellate jurisdiction to review the District Court's order.

## III. MERITS

We review the District Court's denial of a motion to withdraw from representation for an abuse of discretion. *Ohntrup*, 802 F.2d at 679; *see also Whiting*, 187 F.3d at 320. Questions regarding attorney appointment and withdrawal are committed to the District Court's sound discretion, and its determination is guided by the professional rules of conduct. *See Brandon*, 560 F.3d at 537. Golubitsky moved to withdraw

11

due to a conflict of interest, and thus we begin our analysis with the professional rules.[4]

### A. The Model Rules — Identifying a Conflict of Interest

The Virgin Islands Supreme Court adopts the American Bar Association's Model Rules of Professional Conduct ("Model Rules") and the commentary thereto as the Territory's official set of ethics rules. *See In re Joseph*, 56 V.I. 490, 496 n.1 (2012) (per curiam) (citing V.I. Sup. Ct. R. 203(a)). The District Court of the Virgin Islands follows suit. D.V.I. Loc. R. Civ. P. 83.2(a)(1). When faced with motions to disqualify or withdraw, "courts look to the provisions of the [Model Rules] for guidance." *Crudele v. N.Y.C. Police Dep't*, Nos. 97-

---

[4] Golubitsky also argues that although the CJA applies to the District Court of the Virgin Islands, *see* 18 U.S.C. § 3006A(j), and it had the authority to implement a CJA plan and conscript attorneys who are not members of the CJA panel to represent indigent defendants, it is not an Article III court but rather a court of limited jurisdiction, *see* 48 U.S.C. § 1612, and thus did not have the authority to order the parties to implement screening mechanisms. He does not cite any authority to support this proposition, and we are not aware of any. Given district courts' discretion in managing attorney appointment and withdrawal, and given the Model Rules' instructions about screening mechanisms, we do not at this time determine whether and to what extent district courts can require parties to adopt them.

CV-6687 et al., 2001 WL 1033539, at *3 (S.D.N.Y. Sept. 7, 2001).

## 1. Model Rule 1.7: Conflicts of Interest and Current Clients

Model Rule 1.7 applies where attorneys at the same firm have ethical obligations to different clients whose interests may conflict.  The Rule provides that a concurrent conflict of interest exists, so as to preclude representation as a general rule, if "(1) the representation of one client will be directly adverse to another client" or "(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  Model Rules of Prof'l Conduct r. 1.7(a); V.I. Sup. Ct. R. 211.1.7(a).[5]

However, the existence of a concurrent conflict of interest will not preclude representation if four requirements are met:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

---

[5] One example of a concurrent conflict of interest is outlined in the Comments to Model Rule 1.7: when, as a result of undertaking a representation, the lawyer may be required to cross-examine his own client in another matter.  Model Rules of Prof'l Conduct r. 1.7 cmt. 6 (stating "a directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client"); *In re Maynard*, 60 V.I. 444, 449–50 (2014) (same).

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

Model Rules of Prof'l Conduct r. 1.7(b); V.I. Sup. Ct. R. 211.1.7(b).

If any of those requirements is not met—if, for example, the representation is prohibited by law, or the client has not given consent in writing—then the conflicted counsel must withdraw or be disqualified. And, to add another layer, the Comments to Model Rule 1.7 explain that the three categories outlined in Rule 1.7(b)(1)–(3) are "[p]rohibited [r]epresentations":

Ordinarily, clients may consent to representation notwithstanding a conflict. However, as indicated in paragraph (b), some conflicts are nonconsentable, meaning that the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent.

Model Rules of Prof'l Conduct r. 1.7 cmt. 14. So, for example, "Paragraph (b)(3) describes conflicts that are nonconsentable . . . when the clients are aligned directly against each other in the same litigation or other proceeding before a tribunal." Model Rules of Prof'l Conduct r. 1.7 cmt. 17. Whether the clients are aligned against each other, and whether the representation involves the same litigation, "require[]

14

examination of the context of the proceeding." *Id.* But, once the Court determines that the parties are on opposing sides, "[t]here is no exception to Rule 1.7(a) where the lawyer's representation 'involve[s] the assertion of a claim by one client against another client . . . in the same litigation.'" *Nunez v. Lovell*, 50 V.I. 707, 715 (D.V.I. 2008) (Gomez, J.) (second and third alterations in original) (emphasis omitted) (quoting Model Rules of Prof'l Conduct r. 1.7(b)(3)); *see also Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976) (disqualifying an attorney who was a partner at two firms that represented clients on opposing sides of the same litigation).

## 2. Model Rule 1.10: Imputation of Conflicts of Interest

Model Rule 1.10 requires imputing a conflict of interest from one attorney to other attorneys "[w]hile [they] are associated in a firm." Model Rules of Prof'l Conduct r. 1.10(a); V.I. Sup. Ct. R. 211.1.10. If they are, then the conflict of one becomes the conflict of the other, and we must assess whether that presents a prohibited conflict under Model Rule 1.7.

Comment 1 to Model Rule 1.10 states that "the term 'firm' denotes lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law," and clarifies that "[w]hether two or more lawyers constitute a firm within this definition can depend upon the specific facts." Model Rules of Prof'l Conduct r. 1.10 cmt. 1. Courts have taken differing views regarding how of-counsel relationships should be treated for purposes of imputing conflicts of interest. Some have adopted a per se rule of imputation in those cases while others have taken a case-by-case approach of "examin[ing] the substance of the relationship under review and the procedures in place." *Hempstead Video, Inc.*, 409 F.3d at 135–36 (collecting cases).

15

Screening mechanisms at times come into play in assessing whether attorneys are associated in a firm for conflict purposes. The Second Circuit has held that "[w]hether an attorney is associated with a firm for purposes of conflict imputation depends in part on the existence and extent of screening between the attorney and the firm." *Hempstead Video, Inc.*, 409 F.3d at 134. The Court reasoned that

> [an] 'of counsel' attorney, who handles matters independent of his firm and scrupulously maintains files for his private clients separate from the files of the firm, is less likely to be considered associated with the firm with respect to those clients than another attorney in the same position whose client files are not effectively segregated from those of the firm.

*Id.*; *see also* N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 715 (1999) ("[W]e believe screens should be accepted as a means of ensuring that part time lawyers are not deemed to be 'associated' with a law firm.").

Screening may also be relevant in assessing whether the four requirements of Model Rule 1.7(b) are met, specifically whether an attorney will be able to provide competent and diligent services in non-prohibited representations. *See In re Fisker Auto. Holdings, Inc. S'holder Litig.*, No. 13-cv-2100, 2018 WL 3991470, at *2–5 (D. Del. Aug. 20, 2018) (denying a motion to disqualify because the four requirements of Model Rule 1.7(b) were satisfied, and noting that the law firm had put in place effective screening mechanisms).

But a screening mechanism cannot cure a prohibited representation under Model Rule 1.7. *See, e.g.*, *In re Cendant Corp. Sec. Litig.*, 124 F. Supp. 2d 235, 248–49 (D.N.J. 2000)

16

(holding that a proposed screen could not cure a prohibited concurrent conflict of interest).

Golubitsky argues that if he continues as Bellille's counsel, he will experience a conflict of interest and be forced to violate his professional responsibilities under Model Rule 1.7(a). He contends he has associated with the DiRuzzo firm by serving as of counsel, and so any conflicts that arise in that firm—here, its representation of Ayala—are imputed to him. Ayala is expected to testify for the Government in Bellille's trial. Golubitsky would, we presume, be required to cross-examine Ayala. He argues that this presents an unwaivable and nonconsentable conflict.

The Government counters, and the District Court ultimately agreed, that there is no conflict of interest because DiRuzzo's conflict is not imputed to Golubitsky by virtue of their of-counsel relationship. Model Rule 1.10(a) only requires imputing a conflict of interest from one attorney to other attorneys if they are associated in a "firm," Model Rules of Prof'l Conduct r. 1.10(a), and the District Court believed the relationship between Golubitsky and DiRuzzo was too attenuated.

### B. Factual Gaps and Legal Considerations to Address on Remand

There are too many factual gaps in the record for us to apply the Model Rules and decide whether there was a true firm relationship between Golubitsky and DiRuzzo, and accordingly whether there was a concurrent conflict of interest that requires withdrawal. If there were, the District Court would need to assess further the four requirements of Model Rule 1.7(b).

17

Possibly outcome-determinative information came to light at oral argument. The District Court did not make findings on that information (nor can we), and it should create a record on remand in determining whether there is an imputed conflict of interest between Golubitsky and DiRuzzo.

For example, Golubitsky stated at oral argument that he has access to the DiRuzzo firm's files and that he and DiRuzzo speak almost every day. Golubitsky has known and worked with DiRuzzo in different capacities since 2013, as both focused on federal tax litigation. Golubitsky was previously of counsel at the DiRuzzo firm from October 2017 to June 2018. During that time he received remuneration from the firm and worked on cases with DiRuzzo. These statements suggest a working relationship.

Yet other evidence emerged that would further support the District Court's conclusion that the relationship between Golubitsky and the DiRuzzo firm indeed is too attenuated. For example, Golubitsky does not have an office or desk at, or a key to, the DiRuzzo firm. Nor is there any other evidence that DiRuzzo and Golubitsky hold out that they are associated in a firm or make any public representations about Golubitsky's role, such as on the firm's website or on its letterhead. We suggest further development of the record.[6]

Especially puzzling are the factual gaps surrounding the circumstances of Golubitsky entering into an of-counsel

---

[6] The Court may also want to inquire as to the nature of the relationship between DiRuzzo and Golubitsky in connection with Brisa Max. For example, Golubitsky stated at oral argument that DiRuzzo is compensated by Brisa Max for his work on Brisa Max cases. We make no conjecture whether any such relationship is relevant.

relationship with the DiRuzzo firm. He stated that he primarily rejoined the firm in 2019 in order to represent Bellille, but he did not learn of the client conflict until sometime between September 11 and 20 of that year. Golubitsky could not explain, however, why his representation of Bellille did not come up before he joined the firm and before the conflict check if he was re-joining in part to represent Bellille. Equally puzzling is why DiRuzzo's representation of Ayala was not discussed before the conflict check.[7] The District Court should inquire further into why this purportedly did not occur.

The Court may also wish to determine whether Golubitsky and DiRuzzo attempted to associate to create a conflict. If the answer is yes, it may want to take disciplinary action against one or both of the attorneys. Golubitsky would probably be disqualified from representing Bellille based on the manufactured conflict and sanctionable conduct.

To recap, as the record currently stands, it is unclear whether there is an actual of-counsel relationship between Golubitsky and the DiRuzzo firm, whether the label misstates the nature of the relationship, and whether the relationship was possibly entered to create a conflict of interest. So the Court must first inquire whether the baseline facts are as Golubitsky and DiRuzzo allege. If it concludes that there is no actual of-

---

[7] It also emerged that Golubitsky had been appointed to represent Ayala in 2016. However, he never met or spoke with Ayala and withdrew from representing her within two days of his appointment because of an imputed conflict with an attorney at the firm where Golubitsky was an associate at the time. It is unlikely that an attorney-client relationship was ever formed between them, but the District Court should also consider supplementing the record on this to determine whether there is a conflict of interest regarding a former client.

19

counsel relationship, that ends the analysis; there is then no relationship to analyze for sufficient "association" under Model Rule 1.10.

If the facts are as Golubitsky and DiRuzzo allege, however, so that there is an of-counsel relationship, then the Court must still inquire whether they were associated in a "firm" under Model Rule 1.10(a).[8]  We doubt that, if the

---

[8] The District Court relied on *Kilpatrick*, 798 F.3d 365, to conclude that the relationship between Golubitsky and the DiRuzzo firm was too attenuated.  In *Kilpatrick*, a former mayor was charged with, among other things, bribery, extortion, RICO conspiracy, and tax evasion.  *Id*. at 372–73.  Prior to his indictment, Kilpatrick retained James Thomas to represent him in unrelated matters.  *Id.* at 373.  After Kilpatrick was indicted, the district court appointed Thomas and Michael Naughton as Kilpatrick's CJA counsel.  *Id.*  After indictment but before trial, a third party filed a civil complaint against Kilpatrick.  *Id.*  The third party was represented by the firm of O'Reilly Rancilio P.C.  *Id.*  Thereafter, Thomas and Naughton became "of counsel" attorneys with that firm.  *Id*.  At a conflict hearing, Thomas explained that he and Naughton maintained a separate office, had separate electronic filings systems, and had no financial ties to the third-party litigation.  *Id*. at 374.  The district court declined to disqualify them.  *Id*.  After he was convicted, Kilpatrick appealed.  The Sixth Circuit held that Kilpatrick's ineffective-assistance claim failed because he could not show a conflict of interest.  *Id*. at 375.  It concluded that Kilpatrick's attorneys' conflicts were not imputed.  *Id*.  It emphasized "the 'thick ethical wall' between Kilpatrick's counsel and the firm; . . . and . . . the court's decision to appoint

20

allegations are true, the Court can conclude that they are not so associated, as it is unlikely that two attorneys who are genuinely part of or associated with a three-person firm could effectively put in place screening measures to avoid the danger of inadvertent disclosure and the appearance of impropriety.[9]

---

a fourth defense attorney to cross-examine the [third-party] witnesses." *Id.* at 375–76.

*Kilpatrick* is readily distinguishable, however, because here there is no evidence of a "thick ethical wall" in the record. Here there was no additional counsel appointed, and Golubitsky and DiRuzzo had access to the same electronic filing system. Moreover, in *Kilpatrick* the court did not allow two lawyers with an of-counsel relationship to be on both sides of the same case concurrently, even with screening.

[9] By analogy in cases involving former-client conflicts, courts have held that in small firms the existence of even the most effective screening mechanism could not avoid imputing conflicts of interest. For example, in *Cheng v. GAF Corp.*, 631 F.2d 1052 (2d Cir. 1980), *judgment vacated on other grounds*, 450 U.S. 903 (1981), the Second Circuit reversed a district court's failure to disqualify a law firm. The disqualified attorney was a member of a firm of thirty-five attorneys, he worked in the health law division when the case was being handled by the labor division, and the firm submitted affidavits stating that the attorney had not worked on the case. *Id.* at 1054, 1057–58 & n.6. *Cheng* nonetheless concluded that there was "a continuing danger that [the conflicted attorney] may unintentionally transmit information he gained through his prior association [] during his . . . contact with defense counsel." *Id.* at 1058; *see also Baird v. Hilton Hotel Corp.*,

If the District Court again concludes that Golubitsky and DiRuzzo were not associated in a firm under Model Rule 1.10(a), that too ends the analysis. If so, then there is no concurrent conflict of interest under Model Rule 1.7 that presents a problem for Golubitsky's representation of Bellille. As noted, the Court concluded that the relationship between Golubitsky and DiRuzzo was too attenuated, but nonetheless ordered that they implement a wall, suggesting that there is indeed a relationship between them that needed to be walled off. But it cannot be both ways. Either the of-counsel relationship was not genuine and there was no basis for imposing a screen. Or there was a true of-counsel relationship between Golubitsky and DiRuzzo, and a screen alone could not cure the conflict. *See, e.g.*, *In re Cendant Corp. Sec. Litig.*, 124 F. Supp. 2d at 248–49.[10]

---

771 F. Supp. 24, 27 (E.D.N.Y. 1991) (holding that screening mechanism could not be effective in a firm consisting of nine attorneys and that counsel continuing would create an "obvious appearance of impropriety").

[10] The Government cites *Renz v. Beeman*, No. 87-cv-487, 1989 WL 16062 (N.D.N.Y. Feb. 21, 1989), to argue that the relationship between Golubitsky and the DiRuzzo firm is too attenuated. In *Renz*, a magistrate judge declined to impute an of counsel attorney's conflict to his firm where the attorney: (i) worked full-time outside the firm as in-house counsel; (ii) became "of counsel" for the sole purpose of obtaining the firm's assistance in representing his own clients; (iii) accepted no assignments from the firm; (iv) had only a single contact at the firm; (v) shared a secretary; and (vi) only visited the firm once every few weeks. *Id.* at *7–8. Similarly, in our case, Golubitsky asserts he retains his full-time job as in-house

If the Court concludes that Golubitsky and DiRuzzo are associated in a firm under Model Rule 1.10, then there is an imputed concurrent conflict of interest, and it must assess whether the four requirements of Model Rule 1.7(b) are met to allow the representation to continue. To repeat, if even one is not met, the Court must grant the motion to withdraw. With respect to Model Rule 1.7(b)(3), the Court will need to engage in further fact-finding to determine whether Ayala and Bellille's interests are truly adverse in the criminal trial. In essence, will there be asserted "a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal[?]" Model Rules of Prof'l Conduct r. 1.7(b)(3). Or will Ayala testify only against some or all of Bellille's co-defendants but expressly not him? If so, they may not be adverse. We emphasize, however, that, if the Court concludes that Golubitsky is genuinely of-counsel at the DiRuzzo firm, and that Ayala and Bellille's interests are adverse, then it may be a Model Rule 1.7(b)(3) violation for Golubitsky and DiRuzzo, two attorneys in an of-counsel

---

counsel, only works part-time with the DiRuzzo firm, and then only works on a few select cases. Golubitsky and DiRuzzo both testified that they have not had any involvement in the other's work related to this case.

However, there are critical distinctions between these cases that the Government overlooks. In *Renz* the litigants had given their informed consent to be represented by possibly conflicted counsel. *Id.* at *9. And *Renz* involved a motion to disqualify an attorney representing a civil litigant, whereas our case involves a motion to withdraw claiming conflict of interest in a criminal matter where there is a possible Sixth Amendment bar to the representation. Hence *Renz* is not persuasive.

23

relationship, to represent Bellille, a defendant, and Ayala, a cooperating prosecution witness, in the same criminal trial.

Another hurdle may be Rule 1.7(b)(2)'s bar on representations prohibited by law. In a criminal trial, the interests of a defendant and a cooperating government witness are almost always adverse. The Sixth Amendment confers a right to conflict-free counsel and bars representations that involve an actual conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980). We have previously held that such a conflict of interest prohibits a representation, despite waiver by all parties, where counsel has "divided loyalties due to concurrent or prior representation of another client who is a co-defendant, a co-conspirator, or a *government witness*." *United States v. Moscony*, 927 F.2d 742, 749 (3d Cir. 1991) (emphasis added) (holding that counsel should be disqualified from representing a criminal defendant if he cannot ethically cross-examine a witness in that case); *see United States v. Daugerdas*, 735 F. Supp. 2d 113, 118 (S.D.N.Y. 2010) (holding that a law firm's simultaneous representation of a defendant and a cooperating witness presented an actual conflict of interest and warranted disqualification, and stating that the court was not aware of "a single case in which a court permitted a law firm to simultaneously represent a defendant and a cooperating witness with adverse interests in the same criminal proceeding" (emphasis omitted)).[11] Even concurrent

---

[11] To be sure, a criminal defendant can waive his Sixth Amendment rights in some circumstances, but it is not absolute. As the Supreme Court has noted:

> [W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the [Model Rules], the court should not be required

representations of adverse clients in unrelated matters have been barred.[12] *Cf. United States v. Arias*, 351 F. Supp. 3d 198, 200–01 (D. Mass. 2019) (disqualifying defense counsel in a federal drug prosecution because he had an actual conflict of interest based on his concurrent representation of a cooperating witness in an unrelated matter so that the representation was

> to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings . . . .

*Wheat v. United States*, 486 U.S. 153, 162 (1988) (quoting *United States v. Dolan*, 570 F.2d 1177, 1184 (3d Cir. 1978)).

To be clear, not every Sixth Amendment conflicted-counsel issue makes for a prohibited representation, but on the record before us we cannot determine whether the representation here is prohibited. Sixth Amendment rights ordinarily are the defendant's to waive and are tied to the effect on the outcome for the defendant. *See Cuyler*, 446 U.S. at 348-49. Ethics rules, by contrast, target the mere *presence* of conflicting interests, regardless of any effect on counsel's performance. *See* Model R. Prof'l Conduct 1.7(a), 1.16(a)(1).

[12] Even if the District Court concludes that Golubitsky's representation of Bellille is not prohibited by law, it must still consider whether Bellille and Ayala consented in writing to potentially conflicted representation. *See In re Congoleum Corp.*, 426 F.3d 675, 691 (3d Cir. 2005).

25

barred by the Sixth Amendment and put him in violation of Model Rule 1.7); *see also United States v. Stewart*, 185 F.3d 112, 120–21 (3d Cir. 1999) (holding that an actual conflict of interest prohibited a representation, despite waiver by all parties, where a law firm represented a defendant in a criminal RICO prosecution, and separately a defendant in a parallel civil RICO action who had agreed to testify against the defendant in the criminal case).[13]

---

[13] Note that our opinion does not resolve any questions about the scope of Model Rules 1.7(b)(2) and (b)(3). Questions relating to those provisions were neither briefed nor argued by the parties and are not necessary to our disposition. And because it appears highly unlikely that either Bellille or Ayala will consent to any conflict, Rule 1.7(b)(4) probably suffices to resolve this case if the District Court concludes that there is a conflict. *See* App. 131 (Tr. Oct. 31, 2019 hearing, at 8:22); C.A. Dkt. No. 50, at 2 (Bellille letter). So the Court need not resolve the application of subsections (b)(2) and (b)(3) here.

If it were necessary to reach those subsections, Judge Bibas would doubt whether Rule 1.7(b)(3) applied. While a fact witness may claim that a defendant did certain things, she is not "asserti[ng] a claim," meaning a legal right, against that defendant. Model R. Prof'l Conduct r. 1.7(b)(3); *Assert*, *Black's Law Dictionary* (11th ed. 2019) (definition 2); *Claim*, *in id.* Given the difficult questions involved in interpreting Rule 1.7(b)(2) and (b)(3), we avoid resolving them, preferring to await briefing and argument in a future case that squarely presents these issues.

\* \* \* \* \*

Accordingly, we remand for the District Court to develop further the factual record and decide Golubitsky's motion based on that supplemented record. It must first determine whether there is an actual of-counsel relationship between Golubitsky and DiRuzzo (in other words, whether the facts on the ground are as the parties allege).

If there is no actual of-counsel relationship, Golubitsky's representation of Bellille in theory could continue. But the Court should also determine whether Golubitsky and DiRuzzo associated to create a conflict. If the answer is yes, it may want to take disciplinary action. In that scenario, Golubitsky would probably be disqualified from representing Bellille based on the manufactured conflict and sanctionable conduct.

If there is a real relationship, then the Court must inquire whether Golubitsky and DiRuzzo were associated in a "firm" under Model Rule 1.10(a) based on the supplemented record. Were they not associated in a "firm," the representation may continue and there is no need for screening mechanisms.

If there is an actual relationship, and Golubitsky and DiRuzzo were associated under Model Rule 1.10, the Court must assess whether the four requirements of Model Rule 1.7(b) are met. If even one is not met—for example, if the Court concludes that the representation involves the assertion of a claim by one client against another client in the same litigation, or Bellille and Ayala did not consent in writing to the representations—the Court must grant the motion to withdraw.

27